Good morning, Your Honors. Good morning. Nick Harrison for Appellant Mayling. The government's exclusion of the Voluntary Compliance Agreement, which has a value of $200 million to $750 million from the settlement case proceeds, or as an alternate remedy, makes the settlement unfair to Relator Ms. Ling. In addition to unfairness, Ms. Ling would argue that the settlement, which is $38 million in cash, is inadequate. It's inadequate because it doesn't provide any meaningful deterrent effect for future violations, and the reason it doesn't, as the record reflects, is that the government originally requested $582 million in damages for the City of Los Angeles' false claims. Well, Counsel, what's the significance of the fact that there's a specific carve-out in the Voluntary Compliance Agreement? It carves out the current lawsuit. It says, okay, we're going to settle these other matters. There will be ADA compliance that the City would have to comply with, but we're going to continue to litigate the lawsuit that's pending. And in fact, it did continue with years of additional discovery negotiations. What do we do with that? Joe, I think there are two components of Your Honor's question. The first is the significance of the language in the VCA itself. I don't think the parties can decide to carve out from the False Claims Act the requirement that the Relator get a fair share of an alternate remedy. They could say that if they want in a Voluntary Compliance Agreement or other settlement, but the fact that they say it doesn't change the law, doesn't change the facts. You either still have an alternate remedy or you don't. But now the fact that they continue to litigate is another component. It would suggest that the Voluntary Compliance Agreement didn't resolve all of the government's losses. The real key in this case, Your Honor, I think is, I mean, there are other components. The Voluntary Compliance Agreement gave... Well, it has relevance in that the statute seems to require that the alternate remedy take the place of the FCA action. Well, Your Honor, I don't think the statute requires that. There are some cases which are consistent with Your Honor's statement. But I think the only consistent way to uphold the intent of Congress, which is that a Relator get paid a fair share of a recovery, is that you have to look at not only the claims, but the damages or relief sought if, as in this case, the federal government gets a large part of what it bargained for, which was accessible housing. The accessible housing originally lost because of the false claims. If the government gets that back through a Voluntary Compliance Agreement, then most of the government's damages are moot. The government can proceed to litigate in a false claims case to get the remainder of its loss or harm or damages. For example, it can ask for monetary penalties. It can ask for trebling. But isn't it... I mean, the system has built-in limiting principles. There is a fairness yearning. So you would think, logically, HUD would want Los Angeles to pump $200 million immediately in 2019 into fair access. It would make sense they'd want to get the underlying access issues fixed as quickly as possible. But it would also make sense they'd say, you still can't lie to the government. So we're going to spend five more years pursuing the lies so we get to 2024 and they resolve that. That all makes sense unless what the government is doing is this subterfuge to make sure the key template doesn't get money. But you had your chance to make that. I didn't see in the fairness hearing any suggestion of collusion, didn't even bring up the word. Well, Your Honor, we didn't get a chance to put on evidence of collusion. Right, but you would have been able to had you made any argument that there was collusion. Well, we did make that argument in the motion for evidentiary hearing. And we indicated the challenging dilemma Ms. Lane faced, which was that the government's only witness, declarant in support of the settlement and its fairness, Mr. William Edgar from DOJ, advised the court that there were facts regarding the settlement history, the negotiations, that he had not disclosed. But he would disclose them only if the court ordered him to and the court did not order him to. We had asked to, of course, examine Mr. Edgar at the hearing as a sort of compromise compared to a full evidentiary hearing. We were not allowed to do even that. So it's hard to know whether – But even if you're right in the disputed point about there was an unrestricted $100 million offer just to resolve the FCA, even if you're right, five years later you get $38 million after multiple mediations fail, and there's a pretty extensive inquiry by the district court into what are the risks, materiality, scienter. So $38 million out of $100 million five years later, get closure. You don't want to hit the taxpayers of Los Angeles. Where does that look like that's not a good result for the government? Well, that's a key question. The answer is the government's litigation position actually strengthened after the $100 million offer. It didn't weaken because they prevailed on the city's second motion to dismiss the amended complaint. A lot of litigation expense was over the dam between 2016 when that settlement offer was made and 2024 when the final settlement was reached. So the government had less future expenses to look at. So our question to the court was what real evidence-based reason is there for dropping from $100 million, which was actually offered, to $38 million? I mean, all the government had to do was accept a $100 million offer to have almost three times the amount that was ultimately settled for. Appellant Lange just felt that question needed an answer based on evidence. The only answer the court got was an argument from counsel, not been under oath, not subject to cross-examination. Counsel is not supposed to testify. And there's nothing in the record from any party that would suggest any basis for the government's ultimate argument. It wasn't evidence that the reason it settled for $38 million was a calculation based on the proportional share of accessible housing versus affordable housing. That is a post hoc rationalization. There's nothing in the record to support it. So it leaves the question, what was the real reason? Meaning what? That you think you're entitled to know kind of the back end? You want to see the actual back end calculations for this other settlement? To a certain extent. If the real reason, which is what Ms. Lange's suspicion is, I mean, the city, if you look at the history of this case, the city, how should I say this, requested repeatedly a global settlement, a voluntary compliance agreement, and a settlement under the False Claims Act. It wanted both. It wanted credit in the False Claims Act settlement for the expenses it was going to commit to in the VCA. And I think the city ultimately got that in the settlement. There's just nothing on the record where the parties have admitted it. The only thing that explains a drop from 100 million to 38 million from 2016 to 2024, I mean, what happened during that time period other than the government's litigation position improving and their expenses going down? What happened is the city signed the VCA and promised to give the government the bulk of its remedy, the bulk of its damages for lost accessible housing by paying for it, up to 750 million, the city says to date, maybe more now. I guess I'm sort of assuming – I appreciate the argument, right, which is that there's – everything was kind of packed into the VCA, should have been part of this case, and it wasn't. But were these underlying statutory violations themselves remediable under the FCA? Because the FCA is about false claims, and then there's these other allegations of just sort of independent violations of other federal statutes. So the D.C. Circuit case that the district court relied on, I think it was Kennedy v. Novo, U.S. Attorney General Kennedy v. Novo, sort of – it was decided in that case on different facts and a different procedural history, which I'll point out in a moment. It was decided that, well, just because the government does an enforcement action under another statutory authority doesn't make it an alternate remedy because it isn't really about fraud, it isn't really about dishonesty. And I understood that decision, and the distinction here is – and it's worth noting that the court in the Kennedy case actually said near the end of the decision, stated a very important qualification to its ruling, and it said, well, there are safeguards built in to the statute. If the relator thinks they're being treated unfairly and not – because they're not getting a share of this administrative action remedy, they can ask for an evidentiary hearing and try to prove it up to the district court. That didn't happen in the Kennedy case. There was no effort to demonstrate that. Ms. Lang did offer – I'm not sure I understand your answer to that question, counsel, because I think what Novo says is it doesn't matter if the underlying facts are the same or rising out of the same course of conduct, right? The false claims are distinct. It's about lying to the government. And so if the government chooses to resolve related separate problems here in this case, bringing the units up to accessibility standards, that's separate and distinct, so therefore it's not an alternate remedy. So how do you respond to that? Could you have pursued the same claims that were resolved in the VCA agreement in this FCA action? I think they were effectively, Your Honor. I was sneaking up on saying that, and I was a little too long-winded in my last answer. So let me get to the point. The – this isn't a typical enforcement of a statute case where, like say the city innocently broke the housing discrimination law, even self-reported it. HUD did a routine enforcement action. They settled it. That wouldn't be an alternate remedy. Okay, what we have here, though, is years and years of the city knowingly violating the anti-discrimination provisions of the housing statutes, concealing it, not just by not reporting it, but by misrepresenting certification, giving certifications of compliance. So HUD had to go for years and only found out about it when Ms. Ling and her co-relator disclosed the evidence they had compiled in their own investigation. In this case, not in every case of enforcement of a statute, but in this case, what was really happening with the VCA, which, by the way, HUD attempted to negotiate from day one after the key TAM filing, what really is happening here is the government is seeking a remedy, not just for routine noncompliance. They're actually seeking a remedy for the history of dishonesty that led to years and years of delay in noncompliance. It's a different fact pattern than a normal enforcement case. I mean, I guess the difficulty a little bit with the theory as applied to this case is just what happened after the VCA was entered, which was then years of additional litigation followed by a $38 million settlement. So if they had just settled the FCA case for a penny the next day, I think we're in a different situation. But you're basically asking us to assume that the five years of litigation and the $38 million was kind of part of a grand scheme to limit the FCA liability and to kind of limit the relator's recovery. Well, Your Honor, our position, appellate's position, has nothing to do with assumptions. We want the opportunity in an evidentiary hearing to prove what really happened. And we think what really happened is the government finally caved in and gave the city what it wanted, which is a credit or an offset for the value of the voluntary compliance agreement. And we think that Mr. Edgar, if he had been allowed to testify, would have said something to that effect. But then aren't we looking at the fairness hearing in terms of I didn't see any mention even to the court that there was a worry about collusion. And I didn't even see any mention of prior offers, unrestricted offers. So if you don't mention these concerns, what's the trigger that gets you the evidentiary hearing? So I'm asking specifically, can you point to a moment in the fairness hearing where you said something that should have triggered evidentiary inquiry? Can you recall any moment in that fairness hearing? I don't know if I can recall it in quoting what I would have argued, but. Does it surprise you if you never said the word collusion or if you never said there were prior offers to resolve just the FCCA? That would surprise me. Okay. Yeah. No, I think we had a clear record at least in our written filings of the two offers as being distinct. The judge below, the court below, did recognize the two offers in this decision. It also references, I recall, collusion in the decision itself and finding that the court didn't find evidence of that. But the court recognized we were concerned about that possibility. I mean, there are a lot of unanswered questions here, but the two offers, particularly the second. There's another relator in this case, right? You're not the only one? Fair Housing Counsel is the second correlator. Okay. So what are we to make of the fact that your client is concerned about this but the other relator is not? I think you'd probably have to ask Fair Housing, but I found it curious that, you know, they could have adopted Ms. Ling's position and hoped to recover, you know, a bigger relator share. I don't understand why they're not doing that. All right. My time is up, I'm afraid. Thank you, Counsel. Thank you. Good morning, Your Honors. May it please the Court. Stephen Myers for the United States. The government reached the settlement at issue here almost five years after the voluntary compliance agreement was reached with HUD. That settlement came after years of hard-fought litigation, and in the government's judgment, it struck an appropriate balance between, on the one hand, remedying the city's fraud, and on the other, taking account of the litigation risk the government would face, the costs of litigation, and the policy and, you know, public policy consequences of causing the city to spend money on an FCA settlement that it couldn't spend on other important public goods. And Ms. Ling is simply wrong to suggest that that voluntary compliance agreement represented an alternate remedy for the government's fraud claims. The first reason we know that is that, as Your Honors were alluding to, the False Claims Act case didn't go away. It continued, and it was ultimately resolved in a really substantial $38 million settlement. And if you look at the text of the statute, it presupposes that the False Claims Act case didn't continue for the alternate remedy provision to be implicated. It talks about the rights the relator would have if the action had continued and, you know, provides the relator rights in that circumstance. Could it not continue as sort of a cover for hiding recovery that really should have gone to the relator? I mean, you know, in other words, the theory I think is that, you know, the government dealt with this FCA liability on the side, but it didn't want to disclose that affirmatively, so it then kind of papered over that with some discovery and then a further settlement. I mean, is that not a plausible theory, even if it's not a good one on these facts? Your Honor, I could imagine, you know, a much more difficult case, or I think Your Honor was alluding to earlier, where the FCA action was settled, you know, for a penny the day after the voluntary compliance agreement was reached. You know, that would be a harder case, but it's so far from the facts of this case. But it's important. I mean, I had the same line of inquiry. There's no bright-line rule government wins here in terms of any time FCA claims continue after. There could not be an alternate remedy, nor is there a bright-line rule that any time the FCA is severed from the underlying fraud, or here the access issues, there can't be a recovery. In other words, there's always going to be a fairness inquiry that would look into just that point, which is has the government structured this where they're severing the counts, paying off a ton, cut out the key TAM claimant, and then pennies on the dollar resolve the FCA later? That would still always be – in other words, I don't want to make the Barajas claim a toothless. We're giving the government a blueprint to get around the Barajas concern. Right, Your Honor. So there is always the fairness inquiry under C-2B, and that inquiry happened here. And, of course, the district court said, yes, this settlement is fair. And if in that inquiry one discovered that the underlying crimes were resolved big-dollar amounts so as to not give the key TAM their share, then that would contemplate invalidation of the settlement, right? Right, but that would be an analytically distinct question, I think, from the alternate remedy question. It is the government's position that in the overwhelming majority of cases, sort of absent fraud or collusion or sort of cooking the books, that if the FCA action does continue, we don't have an alternate remedy. But there is a separate question. It's surprising just because the Fifth Circuit case that's similar, right, Babaloa? Is that correct? Babaloa? Yes, Your Honor. That was a criminal case initiated before the FCA claim. I can easily understand there couldn't be an alternate reality there. Right. But in this situation, there actually really could be an alternate solution if the government were to work with Los Angeles and say, why don't we both save as much money as we can for the taxpayer and give as little as we can to the key TAM plaintiff? Again, not what happened here. Right. And to take a step back, too, I think it's important to underscore that the government has no interest in cheating relators out of a fair share. The government benefits when relators bring allegations of fraud to its attention. The government wants this system to work. And so there is a sort of conspiratorial flavor to some of what Ms. Ling is arguing here. The government has no interest in blowing this system up. Right. It didn't here. Again, the relators are presumably going to take, you know, somewhere between 15 and 25 percent of a $38 million settlement. That's an awful lot of money. But under Ms. Ling's view of the law, if the $200 million settlement were counted as – if the $200 million VCA were counted as part of the settlement, I think it's likely that the relators would take as much or potentially even more than the United States. And that's a particularly odd outcome in part because the VCA actually contemplates that the city can meet some of their obligations using federal money. So it's not even like all of it is money that the city is putting up. And so, you know, for all of those reasons, that would be a really strange place for us to land. A lot of your argument hinges on, you know, disaggregating the VCA from the later False Claims Act settlement. Right. So what do we make of the city's, you know, correspondence talking about a setoff of the $111 million and then treating there being a setoff for the VCA, which seems to kind of join the two back again? Right. I think the record – you know, what limited information about the history of the negotiations is in the record suggests that the city had been interested in a proposal like that. But it's not the settlement that was ultimately negotiated. And how do we know that? Because the voluntary compliance agreements expressly carves out the fraud claims. That's at Supplemental Excerpts of Record 55. It says specifically that the VCA does not compromise the fraud claims. So I think, yes, the city at one point did want a global settlement. It was hoping to resolve everything around 2019. But that isn't what happened. Instead, the parties continued to litigate the False Claims Act case for almost five years. Your position on the record is not open to the conclusion there was ever a specific, unrestricted, $100 million offer to settle just the FCA. It just doesn't exist in the record. Right. As we set out in our Sir Reply brief, the district court made no such finding. We don't think the evidence supports such a finding. And, you know, in light of the extraordinary and unwarranted allegations of misconduct, we asked around and, you know, we have no reason to think that's what happened. And if you look at the city's brief, that appears to be their understanding as well. The district court, you know, explained why it didn't think it needed discovery or an evidentiary hearing into the history of the settlement negotiations. And so there isn't a comprehensive recitation of every offer that was exchanged by the parties in the record. But we think it would be quite extraordinary for the district court to have engaged in that sort of exercise. The district court explained, this is at 1 ER 18, why there was no need for that sort of discovery or evidentiary hearing. It would cause delay. It would cause burden. And the relator simply had not laid the sort of foundation that would be required to turn a settlement hearing into a mini trial. What's the story with Mr. Edgar who said, well, I have some information, but I can't get into it? Is that because it's essentially privilege from settlement discussions? Yeah, Mr. Edgar was the government's trial counsel. And so he appeared at arguments to explain, you know, what had happened. I think that's correct that his declaration suggested that, you know, if the court ordered him to, you know, obviously he could say more. But usually the parties don't get into the nitty gritty of their settlement negotiations, again, because the law favors settlement. We want to encourage settlement. And the system that Ms. Ling is arguing for would really discourage the parties from reaching settlement. Going back to the alternate remedy issue, we talked a bit about the importance of the FCA action having continued. I also want to just make sure we talk about the point that the voluntary compliance agreement did not resolve fraud claims. So the D.C. Circuit's case in Novo that you were talking about with my friend makes very clear that for a separate proceeding to be an alternate remedy, it needs to have resolved claims that could have been brought in the False Claims Act case. And here certainly Rehab Act claims and ADA claims cannot be brought in a False Claims Act proceeding. But does that just depend on the theory of damages in the False Claims Act case? Because, in other words, the huge theory of damages in the False Claims Act case could be, well, if you had not falsely certified this, we never would have awarded any of this in the first place, and that's a massive number. A more modest number is to say, well, there's a benefit of the bargain, and that's the damages. And that seems to be maybe what you're arguing is the proper measure of damages. But does this argument about what goes in what bucket just depend on the theory of damages for the False Claims Act? I don't think so, Your Honor. I think it depends on the theory of liability. And so the theory of liability in the voluntary compliance agreement is civil rights violations. The theory of liability in the False Claims Act case is fraud. No, true, but could the damages for that fraud be the undoing of all of these contracts? I guess I'm not sure, Your Honor, but I don't think that whether or not the Rehab Act claims, ADA claims, could have been brought in the False Claims Act case turns on that question. And I wanted to highlight the case that my friend raised in a 28J letter I think last week, this court's Adventist decision. We actually think that's quite helpful for the government because it talks about there being a categorical distinction between a prototypical FCA action on the one hand and a case that alleges violations of a statutory or regulatory requirement, in that case Section 340B, on the other. And that's really our point here. There is a categorical distinction between the civil rights violations that were at issue in the voluntary compliance agreements and the fraud claims that were at issue in the False Claims Act case. Just intellectually, that's a little hard to understand. I mean, what's happening here is they're lying that they are in compliance. So the lies are furthering the underlying fraud. They're indivisible. They're not categorically distinct. Well, they certainly are.  In other words, it's any crime, medical fraud, insurance fraud. At the end, the agents say, did you do it? And the person says no. That is a separate 1001 false statement, but it's indivisible with the underlying crime. It would be easy for the government to sever one from the other, resolve one to save money. So I'm not sure what's the rule of law you're urging, that categorically, as long as the government severs counts, lies from the underlying fraud, they don't have to face any problem? Or you would always still have the check that the D.C. Circuit acknowledged that if there's collusion, right, you would always have that check? Sure, yes. So what the D.C. Circuit says is that it having arisen from the same facts is not enough to create an alternate remedy, and we think that's exactly correct. But we're not fighting what the D.C. Circuit says at the end of the NOFO opinion. We actually think it's quite helpful, which is to say that, yes, obviously, at the end of the day, there's still a fairness requirement under C.2.B. The district court needs to make that determination. It did exactly that here. It made that determination. It explained why the settlement was reasonable in light, again, of— And I'm curious. This is a little bit different, very different than your facts. But let's say the fairness hearing had led to suspicions. Then a district court in these civil matters can force the government to continue litigating the FCA? They can actually do that? Is there a case law that actually has a district court saying, I know you want to settle, but I'm telling you you've got to continue to litigate it? So C.2.B. says the settlement needs to be approved, and whether the government at that point would continue litigating or— I know, but is there a case law where a district court has said, Government, not going to let you settle. You have to continue to litigate. I'm not aware of such a case off the top of my head. I don't know how to represent it. It's a little different than in the criminal world, right, which we're seeing a lot of, where the government's saying you can never tell us to continue to prosecute. You can't look behind our dismissal decision. So, again, there is some inquiry under C.2.B., and I suppose that the consequence of a settlement being rejected is that at some point it could lead to more litigation. I think Polanski is helpful here under C.2.A., where it says that it's really going to be an exceptional case where the government's dismissal decision is overturned, given that the government is the injured party, and the government is executing and enforcing the law. I think all of those same considerations apply here, and so it would be very unusual to reject a settlement, and the court shouldn't do so here. Thank you, counsel. Mr. Warren. I'm sorry. Thank you, Your Honor. Don Warren here for the Fair Housing Council of San Fernando Valley. As you know, the Fair Housing Council, we submitted a brief to assist the court in the proper application of the alternate remedy rule. If the court chooses to address that as part of its decision, I don't believe the court needs to address it as part of its decision, much like the district court noted it in a footnote, agreed with our position, but the case turned on other issues about whether the settlement was fair, adequate, and reasonable. And so I am here to answer your questions if you have any. Otherwise, I don't know. So why are you on this side of the table here? I mean, you could stand, your client could apparently stand to benefit if you joined Ms. Ling in opposing the settlement. Why do you take a different position? I've been in this case a long time. I watched Munger, Tolles, and Olson, which I'm sure you're all familiar with their reputation. They're a great law firm. I was involved in the depositions all along the way. I was involved in discovery all along the way. I was working with the DOJ behind the scenes during the depositions, providing information, research, rebuttals, questions. I watched those. I watched the Munger, Tolles firm do a great job. I watched the facts unfold. And at the end of the day, I believe the judge made the correct decision that it was fair, adequate, and reasonable, not because the government intervened, you saw in our brief. I don't believe that's the standard at all, nor should it be, but because there was no futility in the, by settling the False Claims Act and the VCA, there was no futility to continue the False Claims Act case. And often a remedy should occur. Anytime the government decides to collect or pursue a portion or all of its remedy in an alternate proceeding, they can proceed in parallel, as this court recently said last year in the Island Industry case, that there's nothing in the alternate remedy part of the statute that states that the False Claims Act and the alternate remedy cannot proceed in parallel. The government's hands are not tied in which form it can pursue its remedy, nor should it be tied. And I believe the test is, though, if the government does pursue its alternate remedy, a portion of its alternate remedy, of its remedy in an alternate proceeding, is the government or the relator then barred from pursuing that further in the False Claims Act case. For instance, here in the Barajas case, which I stood up 25 years ago before this court and successfully argued for Leo Barajas, my client. There the government had. I didn't realize you were connected to the Barajas case. Very connected. If you can wrap it up, please, you're over time. Thank you. There the government issued, entered into a settlement of part of the Barajas claim, of the government's claim, and settled it with claim preclusion so that it could not be pursued later again, no matter what happened, intervention or not intervention, in the False Claims Act case. And as a result, it got its suspension debarment proceeding proceeds with a retrofit of the damping fluid in a cruise, the flight data transmitter for a cruise missile, got their work done in an alternate proceeding in the agency proceedings, suspension debarment proceeding, and issued into a settlement of the False Claims Act, same allegation, so it can never be pursued, regardless of whether the government intervened or didn't intervene. The very first Rule 12 motion would have been, if the government or the relator had tried to pursue that claim again or further in the False Claims Act case, it would have been a successful collateral estoppel motion, excuse me, res judicata motion. All right. Thank you, Counsel. Okay. We appreciate your input. Let's put a couple of minutes on the clock for Mr. Harrison. So, in terms of avoiding giving the government a path for working around alternate remedy provisions, I don't see any way if this approach the government is proposing here is approved, and the district court did approve it, in any future case, if it involves a false certification of statutory compliance, I don't see any reason why the government can't learn from this experience and do the very same thing in every one of those cases about health funding, education grants, environmental contracts, housing contracts. I think this is creating a major loophole that Congress did not contemplate. And, you know, with due respect, I don't think this court has the authority to create a statutory amendment that would provide such a loophole. Here it's a sizable one. The relators get a share of $38 million. The government gets the benefit of $750 million plus $38 million. That does not resemble what Congress intended. The unrestricted offer, Ms. Fling's declaration, volume two of the record extract at 299, talks about the unrestricted offer, and also there's an email there, Exhibit E, in the district court. In terms of the benefit of the bargain, the government's experts at volume two extract a record 204, volume two extract a record 196 say that they thought, because of the accessible housing not being provided, that the government's damages were $582 million. That was the bargain. That's what the government bargained for. Thank you very much. Thank you, counsel, all three counsel, for your arguments in this last case on today's calendar. The matter is submitted and will be in recess until tomorrow morning. All rise. This court for this session stands adjourned.
judges: Higginson, NGUYEN, BRESS